Mr. Clerk, please call the next case. Docket 4-130-119-WC, Workers' Compensation Commission v. Workers' Compensation Commission, Jennifer T. Appleby. Good morning, and may it please the Court. Wait till closing next. Good morning. I'm Assistant Attorney General Kevin Siegel on behalf of the Illinois Workers' Compensation Commission as agency employer here. Good morning, Counsel. Before I proceed, there's a matter of jurisdiction that I wanted to address to the Court, and it's this. After we filed our briefs in this case around Thanksgiving, this Court decided the case of Treasurer v. Commission, which holds that because the Treasurer in that case did not file a bond, this Court had no jurisdiction to hear the case. We recently filed a motion to cite supplemental authority, notifying the Court that we filed a PLA in that case, which is now pending before the Supreme Court. We believe that that PLA will be decided in May, possibly, although it's possible in September. What I would like to do is suggest that when the PLA determinations come out in May, we will apprise the Court of the decision by the Supreme Court as to whether they've decided to take the case. And if the Court does take the Treasurer case, we would then move to ask this Court stay the appeal, stay this appeal, until a decision on the merits. You said because no bond was filed here, you're concerned with the jurisdiction. Would you concede that we do not have jurisdiction because of the lack of filing a bond if we are affirmed in the Treasurer case? Yes, I'm concerned, but I do not concede that there's no jurisdiction. Okay. Or in the alternative, the Court does not, everyone's assuming they're going to grant the PLA. But that may not be the case either. Correct. And in that instance, alternatively, I would then ask for permission to file a brief supplemental brief or short memorandum explaining why we believe that no bond is required for the Commission or any state agency under Section 18.1. And I could preview that, but if the Court has no questions, we have these procedural issues. At this time, I don't believe the Court has any questions. All right. And those supplemental proceedings, of course, will be properly filed and will be properly considered by this Court at that appropriate time. Thank you. We will apprise the Court. Turning to the merits, we ask that the Court reverse and remand the Commission with instructions that its decisions conform to this Court's body of law, extensive body of cases interpreting Section 305-AE of the Act. Now, there are a couple of firsts here that I want to highlight for the Court. This is, we believe, the first appeal that comes before this Court under Section 18.1 of the Act. We're in this unique circumstance where a special arbitrator is appointed under the Act because the claimant here is a former arbitrator of the Commission itself. We don't believe there's been another case like that. This legislation was passed in 2011. There's another important first here in the record. This was the first time that this arbitrator, this special arbitrator, had ever acted in a Commission case. And he says it several times on the record. Now, I don't mean any disrespect to the special arbitrator, but we're in a unique posture here. He never did one of these before. There's no reference point. And we don't have the safety valve of Commissioners with experience and familiarity protecting the public interest with sound decision-making. And unusually, that really falls in the first instance here to this Court, as though the Court were standing in the shoes of the Commission. Let's explore that for a second. Are you suggesting that we should, because of those somewhat unique facts, we should presume there's some infirmity in the special arbitrator's decision? I'm trying to see how that ties into your point about the merits of the case. Well, there is infirmity in the arbitrator's decision. It doesn't really explain how it – On its merits, not because of the – On its merits. How he got appointed. Correct. But I don't know if there's another instance where an arbitrator's decision becomes the decision of the Commission. And so, these factors compel the Court's close scrutiny of the record. And that close scrutiny can really lead to just one conclusion. Reversal, because even under the manifest weight standard, an opposite conclusion is reflected from the evidence. The key facts of this decision are these. And a special arbitrator either did not take them into account or minimized them. It's this. Ms. Teague, the former arbitrator, returned to work on June 28, 2010. That's just 14 days after surgery for cubital tunnel syndrome, without any serious condition or side effect preventing the normal functioning of her arm. So both the record and the testimony establish that she was able to work nearly immediately after surgery without any lingering disability. Now, how does that establish in and of itself that the award was against the manifest weight? Well, a couple of things. It establishes it, Your Honor, because Section 305E gauges the payment of the award based on whether the injury effectively created a disability that prevented the individual from going back to work. Correct. In this case, and Ms. Teague testified several times in the record that she had no problem whatsoever. She testified at page C84-85 that she was capable of working full-time, stating her injury has not been a hindrance whatsoever. She called the surgery successful, stating her numbness and tingling had subsided at C69. And she said there's nothing that I'm not capable of doing since the 2010 injury at C87. All right, so can we hear on this, though, the critical inquiry is not whether the employee has returned to work. The critical inquiry is whether she has sustained some permanent loss of the use of her arm. And what you're talking about, I think, bears certainly on that issue. Yes. But we're not saying because she went to work 14 days later she couldn't recover, are we? Not entirely. It is not just the time limit, the amount of time, I should say, that she's away from work. It's also whether there are any ñ the standard requires an analysis of whether there are any lingering disabilities, whether she was affected. And she says, there's nothing that I'm not capable of doing. That's virtually dispositive. She's saying that there's nothing that she's not capable of doing when Section 305-E. She testified to certain things she does that cause her problems, using a weed eater, I think, and mowing the lawn and things like that. I mean, the context that you're talking about of her testimony is not at work as an arbitrator. Right. But these other matters outside of the workplace are ancillary. The statute cannot be inferred. The statute says nothing about leisure activities or gardening. You're not seriously going to make the argument that she's not entitled to recover a percentage of loss of use because it doesn't affect her employment only. Now, come on. Now, if a person has an amputation but can still work, are you going to contend that they don't get to recover for the loss of a leg? No, not at all, Your Honor. Well, that sounds like what you're arguing. No, there's a difference between a total loss of a limb and a partial percentage loss. Well, let's change the example then. A person has a terrible injury to their leg so that they hobble around. They don't lose the limb, but it's work-related. But they do their work sitting down. They don't have to walk while they're working. So your argument would be, well, they don't get to recover for a percentage of the loss of the limb, even though they can't climb stairs anymore, they can't run anymore. That simply isn't the law. Well, I want to make clear, Your Honor, that we are not arguing that Ms. Teague is not entitled to any award. We are arguing instead that the award of 15% cannot be squared with this Court's decisions in numerous cases. Ah, there we have a rub. You're not allowed to do that. You can't compare the recovery in this case to recoveries in other cases. That's not allowed in a tort setting, and we don't allow it here. The argument has to be made as to her condition, not her condition compared to someone else's. We don't know what the condition of those other people were, and that's why we never allow that type of argument. That's simply not fair. We don't know. The other people that collected for, it took more time for them to collect, we don't know what their total injuries were. Well, we know how much time that they were away from work. Well, your equation is if you're away from work less time than she is, or more time than she is, but recovered less than 15%, therefore she doesn't collect 15%. That doesn't follow. Well, again, it's not simply being away from work. There is the additional factor that's taken into account in this court's decisions of the post-injury or the post, if you will, away from work recovery procedures, such as physical therapy. In the Ingalls Memorial Hospital case, the injury was 15% of a part of the body, but there was physical therapy that went on there for four years that precluded the individual from going back to work. That's exactly the argument we don't allow, and it's not allowed in the tort setting either. You can't compare a damage award in the tort setting to damages awards given in other cases, even if the injury is similar. Well, then the award here by the special arbitrator has no basis, no foundation. That's a different argument. I think it's the same argument. We have to have a standard to reconcile all these decisions. Otherwise, the special arbitrator or any arbitrator is just assigning a random number. It would be inconceivable on these facts if Ms. Teague recovered 40% or 50% when somebody with the same magnitude of injury away from work at the same time. No, it would be inconceivable for Ms. Teague to recover 50% based on the injury she testified she had, and that's what the argument has to be. Well, let me then turn to what Ms. Teague testified about. We cannot take into account anything else that's happened in this body of case law. Well, and before you leave that and bookmark where you're at, counsel, notwithstanding Justice Hoffman's admonitions in regards to attempting to compare awards and using that as authority to bolster your argument here, you argued in your brief WANTROBA versus Industrial Commission, and there you state in your brief that the court in WANTROBA reduced, and I'm just quoting, it reduced an award to 8% of the person after the claimant originally sought 15%. Is that right? I believe that's right. Okay. I'm reading from page 22 of my brief. Page 22, correct. That's right. But the problem, notwithstanding what Justice Hoffman just indicated, is that that's not what WANTROBA did. The court in WANTROBA simply said that the 8% PPD award was not against the manifest weight of the evidence, even though the claimant was suggesting a 15% award. It didn't reduce the award. So I just simply point that out as cautionary because it substantially misstated the holding in WANTROBA. Well, if I misstated a term, I apologize. I will take a look at that. But we cite another case in that same paragraph where I believe there was a reduction by about one-third, from 22.5% to 15% in the Ingalls case because the 22.5% award was against the manifest weight of the evidence. Can I ask a question? Did any one of these cases you cite reduce the award based on a comparison with other awards? A single one of them? No, I don't believe so. And there's a reason why? Health, you've been asking a lot of questions. Get back to the point you were about to make in your time. Yes, about Ms. Teague herself. In addition to the testimony that there's nothing she's not capable of, that's critical. I just want to focus on that because the section itself, Section 305AE, measures inability, disability to work. She says there's nothing I can't do. And the ALJ gave very little weight to that admission and focused on things that I submit are ancillary. Let's focus on Ms. Teague. She went back to work. There were no restrictions. There were no complications. Yes, there were some ongoing therapies. But Section 305AE doesn't make that the focal point of percentage awards. All this means is that reversal is warranted because the facts here don't compel this high a level of award. Well, are you saying that the facts compel no award? Not at all. She's entitled to some award. Why? Because she can go back to work and do everything else that she said she could do. She was away for two weeks, two weeks plus. She did have this surgery, which is not insignificant. It was recovery. She did some physical therapy. So it's not de minimis. What is the purpose of these awards? I mean, your time is up. I'll return. Yes. My question was, what do you suggest? We would suggest that the court revam this for an award, a suggestion of an award, in alignment with what was decided in Guantrova. Give me a percent. 77.5%. I just wondered if you were going to say, like, 12. We're here arguing about 15 and 12. Thank you. Okay, counsel. Counsel, have we made an accommodation? Yes. Okay, great. If not, we can make some adjustments here without any problem. I'm not used to this. Oh, I didn't know that happened. I learned something today. I'm not used to this. In our old courthouse in Ottawa, we make arrangements at counsel table. That's pretty impressive. I'll have to see what they got this given for home. That's pretty cool. Before you begin, there have been two motions filed by Mr. Segal to cite supplemental authority and then to correct the motion to cite supplemental authority. We have not received any response, and I'm not sure what the time frame was. We just got these. We're well within time to respond to those. We'll ask from the bench, do you have any opposition to the granting of these motions?  I have no opposition to that, Your Honor. Okay. I don't see the relevance of it. But I have no opposition. Okay, very good. The record shows. Please don't note it down. Thank you. Thank you. May it please the Court and Counsel. Good morning, Your Honors. My name is Jim Wozorek, and I represent Jennifer T., now known as Jennifer Carroll, and this appellee in this case, the defendant, and the petitioner of the lower court. As Mr. Segal said, he touched a little bit on the fact that the special arbitrator The special arbitrator was, it's my understanding, was an application process. It was appointed by the Commission on the Commission Review Board. So to come here, it almost seems like he's implying that he wasn't qualified to hear this case, at least that's what my understanding was of it. I think that that's a totally irrelevant argument on this case. He was appointed by the Commission, and it was all through that. So I don't see the relevance in it. I don't think the decision is going to turn on that, although I can't anticipate, but I guess what my question would be is, as Mr. Segal has laid down the gauntlet, where does this 15% come from? What is the rational, legal, factual basis in the evidence for that specific award? Well, I think that the arbitrator there, we had three hours of testimony. Ms. Teague was subject to direct cross and even questions by the special arbitrator. She did testify when asked about her residual disability. She testified she had discomfort in her right elbow. She has difficulty driving. She has occasional tingling and numbness in the scar area there. She has ongoing discomfort at the surgical site. She can only type for about 30 minutes and has to rest. She rests on a pillow. She did say there's nothing she can't do, but she still has residual disability. The yard work she does, she had to hire somebody to do our yard work because of her elbow. So the numbness and the tingling in her fingers did subside. As a layman trying to explain these decisions at times, or to laymen to get them to understand, what is this permanent partial disability from your perspective? It's to compensate an individual for a permanent disability. And it's not premised on any types of inability to work or the weeks, but it's for the residual disability that they have, what they can't do now or what they have discomfort doing that they could do prior to the injury. Well, it seems like the arbitrator would support only discomfort. Is that correct? Well, I think there's discomfort, tingling. She can't do certain things. What are those things? On one side of the ledger you have discomfort, which would be pain. In my ordinary sense, it would be pain. It would be the tingling. That would be discomforting. But then things you can't do, those are fairly concrete. I mean, they're two different categories. Well, I think the thing she can't do now is, like I say, her arm does get tired. She does have issues with it. She had surgery on this. Well, that's all resolved itself, apparently, because now she may have discomfort. Wasn't there specific testimony? I'm sorry. Go ahead. I guess the thing in the other category, the other box of permanent disability, would be I can't type for 45 minutes. I'm disabled to the extent that before I could type for 45, 50 minutes, but now I only can type for 30 minutes. I'm disabled in that physical sense. Apart from symptoms and tingling. And I think all that comes into play as a totality of all the circumstances, not just one single thing. But I think if you take a look at that, it's all of those things. But it wouldn't have to be, would it, under that definition? It could be something in that box and nothing in that box, or something in that box and nothing in that box. I think that's true, but I think that, like I say, if you look at that whole thing, she's still suffering after this surgery, after this incident, that she was prior to it. But wasn't there evidence that her doctor recommended that she hire her yard work done? Correct. Correct. And that's what she's done. So, I mean, when we talk about, okay, she said, there's nothing I can't do. But on the other hand, there was evidence that it really bothered her to do yard work, and her doctor said, stop doing it, hire it done. Correct. And Dr. McKinnon, in that same report, said, you know, there are certain activities she should avoid. Now, she didn't really go into a lot of explanation of what certain activities, but she did say that there are certain activities that she avoids. Do we know what those are? We keep talking in general terms. Does it have something to do with the housework, tools, lifting? We're trying to figure this out. Well, like she said, she sent her testimony about carrying laundry, carrying a bag of dog food, lifting heavy objects, things like that. Shoveling snow. Shoveling snow, things of that nature. She's restricted in those activities? She's restricted in those activities, and they cause her pain when she doesn't, and now she used to do several of those on her own, shoveling snow, her yard work, and now she has to hire that out. She also testified that she has fatigue in her elbow when she uses a computer in excess of 30 minutes. Correct. Okay, so back to the layman again. Okay, those are things that are outside of the work environment, the things you've listed at this point. Correct. I think opposing counsel is suggesting that maybe I misunderstood that we should look at PPD only within the context of the work environment and the job duties performed before. Well, you said outside the realm of the job duties. I think typing would be in her job duties. Well, no, but the question is, shouldn't the commission look to the total loss of the individual related to her work injury, regardless of where that loss occurs? So why wouldn't the commission look to the manner in which she is limited outside of her employment, vis-a-vis I can't use my computer for more than 30 minutes, I can't shovel snow, I can't do my lawn any longer, these are all things that my body used to be able to do but can no longer do because of an injury that's work related. So why is that irrelevant? That's all relevant to the fact that it should go to the... Well, counsel seems to be arguing it isn't. The big question is, what can't she do at work? And if she can do her work, then I guess she hasn't been injured. She doesn't have permanent partial disability. Well, she has been injured, and it did affect her work. Like I said, her work has been affected, and it doesn't... Does the act, does the statute say that only work? That was my question. I mean, the disability goes to what? The activities of everyday life, or only, as opposing counsel is suggesting, the activities in the work environment that are required of the work environment. I think it goes to the combination of it all. It's just, if you suffer an injury and it does affect your personal life, your private life, you still should be compensated for that through the act. It's just not specifically a work-only type of injury that you're compensated for. Okay. Do we have any cases that say that? I couldn't find any. And opposing counsel does cite 12 cases in here, and I went through all 12 of those cases, and I couldn't see anything really on point on any of them. I had to do a batch of things on that. When I tried to find a nature and extent only case on a manifest way to the evidence, it was very, I couldn't find one. That's because we give extra deference to the commission on nature and extent. Right, exactly. Which we're told we have to. Right, so that's why it was, I couldn't find anything on point. And you're right, I think that extreme deference is given to the commission's decision, especially on the nature and extent, because they're the experts in this case, and they're the ones that can decide the nature and extent. Well, your opponent makes a point that this special arbitrator doesn't have the expertise that the commission has, and therefore, should he really be given the extra deference we give to the commission? I think that goes to a whole different argument, that is, maybe look at the appointment process, see what his qualifications were, things like that. I don't know what they were, you know. Evidently, the commission and the commission board that appoints the special process, or the special arbitrators in these cases, did determine that he was qualified to do it. How are the commissioners, how is that determination made as to qualifications and who makes it for commissioners? All I know is that it's an application process. It's my understanding, I don't know, but it's an application process. It goes through a commission review board. They make a decision, I don't know what factors they use, and then the commission appoints the special prosecutor. I think this is... Yeah, that's the way that gets... Arguably, this whole special legislation for this process was designed to give to a certain class of employees the benefit of review that everyone else gets. Am I correct? Correct. Okay. And everyone else gets reviewed by three commissioners. So the question I have is, the process of selecting... and we're supposed to give deference to these commissioners and arbitrators because of their special expertise in this area of labor, injuries, etc. Does this process produce the same qualified type of commissioner, special commissioner, that this process for the three does? I would assume so. I'm not privy to the information on how they select these things, but I think that's an issue between the commissioner and the workers' compass at all. I don't know how to answer that. Well, this is outside the record anyway, isn't it? Right. This is outside the record. We can't take judicial notice of this. We don't know what happens outside the record. Right. Opposing counsel also states that she was only off work for 14 days. And she did. Now, is she penalized because she went back to work? It was her vacation month. She used her vacation time during this. There was no argument on any of these issues, TDD, none of that. So she was going to physical therapy during that time. And she did work modified duty. I think in his brief he touches on modified duty. To me, modified duty is basically doing anything that you had to change or modify, basically, that you did before. And she did. She was stamping contracts with her left hand. She was taking time. She was taking breaks. She used her pillow. I think all of that. So to say that two weeks doesn't equate to the award that she received at the commission, I think that that argument is somewhat flawed. Because it's almost like Justice Hoffman said with an amputation. You can have an amputation and get it fixed that next day and go back to work. Does that mean that you're entitled to anything less because of the disability just because you went back to work that quick? I think that that's an issue there that was flawed. She used her vacation time and things like that. And we're talking about an arbitrator here. It's not a physically stressful job. I'm sure it is mentally and all that. But I think it's not like some of the cases that were cited where you've got coal miners, iron workers, and auto mechanics and things of that nature. Well, medical evidence is, but I think all the doctors that saw her on this, they all agreed with her symptoms and everything like that. So I don't think there's any question with that. And the arbitrator weighed the credibility of the witness. It can be inferred. Does he say anything specifically, I saw Ms. Teague credible in his order? No. But I think it can be inferred by the fact that through the exhibits, the record, all the testimony across, the special arbitrator asked questions of testimony. I think all of that and the totality of all of that goes to the credibility of the witness. He was there. And so I think that Ms. Teague met her burden in this case. I think that the facts support the commission's decision. I think it was reasonable. I think it was well thought out. They seem to cite that in the finding, the fact and the conclusion that it was very brief. He went through four pages of a written decision in his saying. He thought it out. He cited several factors that he used, including the age, occupation, and the disability. She was right-hand dominant, all of that stuff. He does cite that in his conclusion in his finding the fact that that's what he used. I think we can draw that he used all those factors in determining the percentage of disability and her credibility in this matter in determining the nature and standard of her injury. So I think it's reasonable. I think that I would ask that this court affirm the decision of the commission and this decision is not against the manifest place of the evidence. And if you have no further questions. I don't believe we do. Thank you, Counselor. Thank you. Thank you. Give me one of these. A couple of quick points. There's no question of credibility here. It's a question of statutory interpretation. It's not a question of laymen may or may not understand, nor is there a question of things that might, as you suggested, Justice Hoffman, things my body cannot do. Because of a work-related injury, Section 8E compensates incapacity affecting the claimant's ability to work resulting from accidental injury. It does not discuss major activities. It does not discuss wrongdoing. Read that specific statutory where you read that. Tell us the language you're relying on to say that. I am not, unfortunately, have a full quote in front of me, but I'm reading from page one of my reply brief. I don't know exactly where in 8E it says it compensates loss of ability to work. Well, the word work is in Section 8E. The other concept, work resulting from accidental injury. Temporary total incapacity for work. Resulting from, there's an ellipsis, accidental injury. And shall receive in addition thereto compensation for a further period for the specific loss herein mentioned. Which does not necessarily go to these other outside activities. The focus is on work. So is your argument that she should have received an award under 8D2 as a person as a whole? Under 8D2? Sure, because that says that we compensate them from pursuing other suitable occupations or which have otherwise resulted in physical impairment. So maybe she should have gotten a person as a whole, which by the way would cost the state more money. But she didn't. No, but maybe we should send it back for a person as a whole. Well, I am not recommending that. We might if we sustain your argument on 8E. I don't see where 8E is limited to loss of ability to work at all. Well, it does not talk about by its plain terms things like modified duties or the things that you are mentioning, Justice Holdridge, discomfort, adjustments, inconveniences, having to take a break after a half an hour of typing instead of, I don't know, 40 minutes or whatever a normal person does. For some unknown reason, the special arbitrator's decision emphasizes these extraneous facts without taking into account the critical point that this woman recovered from surgery in a very short amount of time. I must point out, unlike many of this Court's other cases, including cases involving pubital tunnel syndrome, for there to be a coherent, rational decision that's capable of appellate review, we have to understand how this decision was reached. Counsel says in his brief there were reasoned findings of fact. Well, that's not the standard. It's whether there were reasoned conclusions of law. We don't have that here. So there are no further questions. Did you have a right to ask under the Act for specific findings of fact after this decision was issued? Did we ask? Do you have a right to ask? Well, I think it's given under the ____. I think you have a right to ask for specific findings under the Act if you so choose. Did you do it? I don't believe we did it, nor do I believe that we had to ask an arbitrator for a reason for findings of fact and conclusions of law, which are required under the Administrative Procedure Act. I think you have a right under the Workers' Compensation Act to request when a decision is issued that there be specific findings of fact and you have a period of time within which to do it. Well, I don't remember if that's in the record, Your Honor. We may not have asked for that. We are saying facts, but you were saying conclusions, reasoned conclusions. Conclusions of law. There are certainly facts. The decision is all facts. We just don't have the facts applied to the law to reach a conclusion. The missing A and C of any law school exam. So we would ask the court to reverse the circuit court, vacate the special arbitrator's decision, or a new decision under Section 8E of the Act that is consistent with the record and that explains the basis for its decision. Thank you. Thank you, counsel. Both your arguments in this matter this morning will be taken under advisement. Written disposition shall issue. The court will stand in recess until 9 a.m. tomorrow morning.